## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AN AN LIU, derivatively on behalf of ARCIMOTO, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| MARK D. FROHNMAYER, DOUGLAS M. CAMPOLI, TERRY L. BECKER, NANCY E. CALDERON, JEFF CURL, JESSE G. EISLER, and JOSHUA SCHERER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ARCIMOTO, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff An An Liu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Arcimoto, Inc. ("Arcimoto" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Mark D. Frohnmayer, Douglas M. Campoli, Terry L. Becker, Nancy E. Calderon, Jeff Curl, Jesse G. Eisler, and Joshua Scherer (collectively, the "Individual Defendants" and with Arcimoto, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Arcimoto, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own

acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arcimoto, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Arcimoto's controlling shareholder, directors, and officers from February 14, 2018 through March 22, 2021, both dates inclusive (the "Relevant Period").

2.      Arcimoto is an Oregon corporation based in Eugene, Oregon, that develops, markets, and sells a line of three-wheeled electric vehicles. It markets its flagship product as the "Fun Utility Vehicle" or "FUV."

3.      Beginning February 13, 2018 and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Arcimoto's business, operations, and prospects. Specifically, during the Relevant Period, the Company issued a number of press releases which touted the Company's partnerships and preorders.

4.      However, during this time, the Individual Defendants failed to disclose that preorders were not being meaningfully filled, that the Company's vehicles were or would soon be under a safety recall, and that two of Company's touted partnerships, including its largest customer, were undisclosed related parties.

5.      The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time one of the Individual Defendants benefitted from lucrative insider sales at artificially inflated prices for proceeds of approximately $372,000.

6.      The truth emerged on March 23, 2020 when *Bonitas Research* published a report (the "Bonitas Report") that revealed, *inter alia*, that the Company had hardly filled its preorders, that the Company's vehicles suffered from safety defects resulting in recalls, and that certain Company sales, including to the Company's largest customer, were undisclosed related party transactions.

7.      On this news, which was released before the markets opened, the Company's share price declined by $1.10 per share—more than 6.5%—from its March 22, 2021 closing price of $16.77 per share to close March 23, 2021 at $15.67.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's announced preorders, totaling 422 vehicles, were either not filled or completely fabricated, with only nineteen vehicles actually delivered; (2) all or almost all of the Company's vehicles were under a safety recall; (3) the Company's single largest customer was an undisclosed related party owned by FOD Capital, LLC ("FOD Capital"), which was at one time among the Company's largest shareholders; (4) another of the Company's touted partnerships with HULA Holdings ("HULA") was an undisclosed related party transaction; and (5) the Company failed to

maintain adequate internal controls. As a result of the foregoing, Arcimoto's public statements its preorders and partnerships were materially false and misleading at all relevant times.

9. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while one of the Individual Defendants sold Company shares at inflated prices.

10. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Actions") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's and CFO's liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of

Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

15.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Arcimoto. Plaintiff has continuously held Arcimoto common stock at all relevant times.

20.     Plaintiff is a citizen of Canada.

**Nominal Defendant Arcimoto**

21.     Arcimoto is an Oregon corporation with its principal executive offices at 2034 West 2nd Avenue, Eugene, Oregon 97402. Arcimoto's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "FUV."

**Defendant Frohnmayer**

22.     Defendant Mark D. Frohnmayer ("Frohnmayer") is the Company's President, CEO, and Chairman of the Board, and has served in all three roles since he founded the Company in November 2007. According to the Company's Schedule 14A filed with the SEC on April 29, 2021 (the "2021 Proxy Statement"), as of April 14, 2021, Defendant Frohnmayer beneficially owned 7,639,279 shares of the Company's common stock, representing 21.1% of the Company's outstanding common stock. This ownership coupled with his positions at the Company make him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on April 14, 2021 was $11.87, Defendant Frohnmayer owned approximately $90.7 million worth of Arcimoto stock.

23.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Frohnmayer received $453,645 in compensation from the Company, including $97,708 in salary and $355,946 in stock awards. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year") Defendant Frohnmayer received $55,844 in total compensation, including $36,468 in salary and $19,376 in all other compensation. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), Defendant Frohnmayer received $59,584 in compensation from the Company consisting entirely of salary.

24.     Upon information and belief, Defendant Frohnmayer is a citizen of Oregon.

25.     The 2021 Proxy Statement stated the following about Defendant Frohnmayer:

Mark Frohnmayer has been our President, Chief Executive Officer and Chairman of our board of directors since our founding in November 2007. Previously, he was one of the founders of GarageGames.com, Inc., a software development company successfully sold to IAC, Inc. in 2007. Mr. Frohnmayer holds a B.S. in Electrical Engineering and Computer Science from UC Berkeley.

Among other experience, qualifications, attributes and skills, we believe Mr. Frohnmayer's perspective as one of our founders, his extensive leadership and experience as our President and Chief Executive Officer since our founding, and his knowledge of our operations, brings to our board of directors critical strategic planning and operational leadership that qualify him to serve as one of our directors.

**Defendant Campoli**

26.     Defendant Douglas M. Campoli ("Campoli") has served as the Company's CFO and Treasurer since June 2015. According to the 2021 Proxy Statement as of April 14, 2021, Defendant Campoli beneficially owned 143,611 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2021 was $11.87, Defendant Campoli owned approximately $1.7 million worth of Arcimoto stock.

27.     For the 2020 Fiscal Year, Defendant Campoli received $192,756 in compensation from the Company, including $115,001 in salary and $77,755 in option awards. For the 2019 Fiscal Year, Defendant Campoli received $139,628 in compensation from the Company, including $100,000 in salary and $39,628 inn option awards. For the 2018 Fiscal Year, Defendant Campoli received $134,453 in total compensation, including $100,000 in salary and $34,453 in option awards.

28.     Upon information and belief, Defendant Campoli is a citizen of Oregon.

29.     The Company's annual report filed on March 31, 2021 on Form 10-K with the SEC stated the following about Defendant Campoli:

Douglas M. Campoli has been our Chief Financial Officer since June 2015. Prior to joining Arcimoto, he was the Founder of Strategic Financial Consulting from February 2013 to June 2015, providing financial consulting services for startup and existing businesses. From September 2012 to September 2013, Mr. Campoli was

Chief Financial Officer of ManaFuel, bringing energy independence to Pacific Island Nations. From May 2007 to February 2011, he was Chief Financial Officer of GarageGames.com, Inc. From 2004 to May 2007, Mr. Campoli was Chief Financial Officer of SeQuential Biofuels, Inc. Prior to 2004, he held various financial positions at Genuity Inc. (previously GTE Internetworking) and AT&T Paradyne Corp. Mr. Campoli holds a B.S. in Business and Finance from the University of South Florida and an M.B.A. with a concentration in Finance from the University of Tampa.

**Defendant Becker**

30.    Defendant Terry L. Becker ("Becker") has served as a Company director since May 2015 and as the Company's Chief Operating Officer ("COO") since September 2017. He also worked at the Company as Engineering, Manufacturing, and Operations Manager from October 2012 to February 2014. According to the 2021 Proxy Statement, as of April 14, 2021, Defendant Becker beneficially owned 127,176 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2021 was $11.87, Defendant Becker owned approximately $1.5 million worth of Arcimoto stock.

31.    For the 2020 Fiscal Year, Defendant Becker received $152,159 from the Company, solely consisting of his salary. For the 2019 Fiscal Year, Defendant Becker received $172,308 in compensation from the Company, including $135,000 in salary and $37,308 in option awards. For the 2018 Fiscal Year, Defendant Becker received $169,453 in total compensation, including $135,000 in salary and $34,453 in option awards.

32.    Upon information and belief, Defendant Becker is a citizen of Oregon.

33.    The 2021 Proxy Statement stated the following about Defendant Becker:

Terry Becker has been a director since May 2015 and Chief Operating Officer since September 2017. From February 2014 to September 2017, Mr. Becker was Director of Engineering and Global Product Support at Peterson Pacific Corporation. Prior to that, from October 2012 to February 2014, Mr. Becker worked at the Company as its Engineering, Manufacturing and Operations Manager. From December 2008 to September 2012, Mr. Becker was the Deputy Director of Operations for an AeroTech segment of John Bean Technologies

Corporation. Mr. Becker holds an A.S. degree in engineering physics from Loma Linda University and a B.S. in Mechanical Engineering from Walla Walla University.

We believe Mr. Becker's engineering and process oversight experience and his experience with expansion-stage growth companies, brings to our board of directors critical skills related to manufacturing oversight of growing organizations, strategic planning and corporate governance and qualify him to serve as one of our directors.

**Defendant Calderon**

34.     Defendant Nancy E. Calderon ("Calderon") has served as a Company director since April 2020. She also serves as the Chair of both the Audit Committee and the Nominating and Governance Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, as of April 14, 2021, Defendant Calderon beneficially owned 15,546 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2021 was $11.87, Defendant Calderon owned approximately $185,000 worth of Arcimoto stock.

35.     For the 2020 Fiscal Year, Defendant Calderon received $104,068 in compensation from the Company, all in fees paid in stock.

36.     Upon information and belief, Defendant Calderon is a citizen of New York.

37.     The 2021 Proxy Statement stated the following about Defendant Calderon:

Nancy Calderon has served on our board of directors since April 2020. Ms. Calderon is a certified public accountant with over 30 years of experience in public accounting. Prior to her retirement in September 2019, Ms. Calderon had served in various roles at KPMG, LLP, a global network of professional firms providing audit, tax, and advisory services ("KPMG"), since 1986. From July 2012 until September 2019, Ms. Calderon served as the Global Lead Partner for a Fortune 40 account, managing a global team of over 500 professionals in more than 50 countries. In addition to her role as Global Lead Partner, during the same period, Ms. Calderon served as a senior partner of KPMG's Board Leadership Center and a board member of KPMG's Global Delivery Center in India. From June 2008 until June 2012, Ms. Calderon served as KPMG's U.S. National Partner in Charge of Operations and its Americas Region Chief Administrative Officer. Prior to

June 2008, Ms. Calderon held various positions at KPMG, including National Director of Trust and Estate Tax Services; National Director, Tax Outsourcing; and Senior Manager, Corporate Tax Services. Ms. Calderon currently serves on the board of directors of Northern Technologies International Corporate (NASDAQ: NTIC) and is a member of the audit committee, as well as serving on the board of directors of Belden, Inc. (NYSE: BDC) and is a member of the audit committee. Ms. Calderon holds a B.S. in Accounting from the University of California, Berkeley and an M.S. in Taxation from Golden Gate University.

We believe Ms. Calderon's public accounting experience brings to our board of directors important skills related to corporate finance, among other matters, and qualifies her to serve as one of our directors.

**Defendant Curl**

38.     Defendant Jeff Curl ("Curl") served as a Company director from May 2015 until January 2020, when he resigned. At the time of his resignation, he was serving as Chair of the Audit Committee and as a member of both the Compensation Committee and Nominating and Governance Committee.

39.     Upon information and belief Defendant Curl is a citizen of Oregon.

40.     The Schedule 14A which the Company filed on April 1, 2019 the SEC (the "2019 Proxy Statement") stated the following about Defendant Curl:

Jeff Curl has been a member of our board of directors since May 2015. He has been the Chief Financial Officer and Chief Operating Officer of Summit Benefit and Actuarial Services, Inc. since May 1994 and has also been Senior Partner and Architect of the Affordable Care Act Service Model at Summit Benefit and Actuarial Services, Inc. since March 2010. Mr. Curl holds a B.S. from the United States Military Academy at West Point and an M.B.A. from the University of Oregon — Charles H. Lundquist College of Business.

We believe Mr. Curl's experience as chief financial officer and chief operating officer of a regulatory compliance company and familiarity with investments in early-stage companies brings to our board of directors important skills related to corporate finance, among other matters, and qualifies him to serve as one of our directors.

**Defendant Eisler**

41.     Defendant Jesse G. Eisler ("Eisler") has served as a Company director since September 2018. He also serves as Chair of the Compensation Committee and as a member of both the Audit Committee and Nominating and Governance Committee. According to the 2021 Proxy Statement, as of April 14, 2021, Defendant Eisler beneficially owned 480,436 shares of the Company's common stock, representing 1.3% of the shares outstanding at that time. Given that the price per share of the Company's common stock at the close of trading on April 14, 2021 was $11.87, Defendant Eisler owned approximately $5.7 million worth of Arcimoto stock.

42.     For the 2020 Fiscal Year, Defendant Eisler received $112,997 in compensation from the Company, all in fees paid in stock.

43.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Eisler made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| November 23, 2020 | 10,000 | $16.76 | $167,600 |
| January 21, 2021 | 1,780 | $48.92 | $87,077 |

Thus, before the scheme was exposed, Defendant Eisler sold 11,780 shares of Company common stock at artificially inflated prices for proceeds of $372,400. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.     Upon information and belief, Defendant Eisler is a citizen of Connecticut.

45.     The 2021 Proxy Statement stated the following about Defendant Eisler:

Jesse Eisler has been a member of our board of directors since September 2018. He is an Orthopedic Spine Surgeon, Sole Proprietor of the Connecticut Back Center, LLC and Assistant Clinical Professor in the Department of Surgery University of Connecticut, with attending privileges at: Manchester Memorial Hospital, Rockville General Hospital, Saint Francis Medical Center and Hartford Hospital. Dr. Eisler has extensive research experience, numerous publications, honors and

awards. He holds a B.S. and M.S. with honors from Stanford University, a Ph.D. and M.D. from Mount Sinai School of Medicine.

We believe Dr. Eisler's extensive research experience brings to our board of directors important skills related to scientific methodology, among other matters, and qualifies him to serve as one of our directors.

**Defendant Scherer**

46.     Defendant Joshua S. Scherer ("Scherer") has served as a Company director since September 2018. He serves as a member on each of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. In addition, he serves as Lead Independent Director. According to the 2021 Proxy Statement, as of April 14, 2021, Defendant Scherer beneficially owned 90,486 shares of Company common stock. Given that the price per share of the Company common stock was $11.87 at the close of trading on April 14, 2021, Defendant Scherer owned approximately $1.1 million worth of Arcimoto common stock.

47.     For the 2020 Fiscal Year, Defendant Scherer received $112,997 in compensation from the Company, all in fees paid in stock.

48.     Upon information and belief, Defendant Scherer is a citizen of New York.

49.     The 2021 Proxy Statement stated the following about Defendant Scherer:

Joshua Scherer has been a member of our board of directors since September 2018. He is a Founding Partner of Ducera Partners, an independent investment bank relied upon by decision makers to provide critical advice on complex and transformative transactions. Prior to the launch of Ducera Partners in June 2016, he spent eight years with Perella Weinberg Partners, an investment banking firm, most recently as a Partner. Mr. Scherer has over 25 years of investment banking experience, starting his career with Merrill Lynch in New York and Hong Kong, and thereafter with Houlihan Lokey where he focused on financial restructuring engagements.

Mr. Scherer has been actively involved in dozens of financial transactions, including M&A (buyside, sellside, distressed, etc.), financings (IPOs, other public equity, public and private debt, etc.), and financial restructurings (representing companies and investors). In addition, Mr. Scherer has advised on numerous fairness opinions and also provided testimony over a dozen times, including as a financial expert witness. He has advised companies in many of the most high profile

and transformative transactions, including the restructuring and sale of Hostess Brands as well as in the financial restructurings of Caesar's Entertainment, Hawker Beechcraft and Spectrum Brands, among others. Further, Mr. Scherer is leading the investment banking renewables practice for Ducera Partners, which in part focuses on the Electric Vehicle (EV) industry.

Mr. Scherer received a Bachelor of Arts in Economics from Middlebury College, where he graduated Summa cum Laude and was elected to Phi Beta Kappa.

We believe Mr. Scherer's capital market experience and familiarity with investments in early-stage companies brings to our board of directors important skills related to corporate finance, among other matters, and qualifies him to serve as one of our directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Arcimoto and because of their ability to control the business and corporate affairs of Arcimoto, the Individual Defendants owed Arcimoto and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Arcimoto in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Arcimoto and its shareholders so as to benefit all shareholders equally.

51.     Each controlling shareholder, director, and officer of the Company owes to Arcimoto and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Arcimoto, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the controlling shareholder, officers, and directors of Arcimoto were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Arcimoto, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Arcimoto's Board at all relevant times.

55.     As the controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASQAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC

14

all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56. To discharge their duties, the controlling shareholder, officers, and directors of Arcimoto were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Arcimoto were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Oregon and the United States, and pursuant to Arcimoto's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Arcimoto conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Arcimoto and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Arcimoto's operations would comply with all

applicable laws and Arcimoto's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to Arcimoto and the shareholders the duty of loyalty requiring that each favor Arcimoto's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Arcimoto and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, directorial, and controlling positions with Arcimoto, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Arcimoto.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Arcimoto was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

65.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Arcimoto, and was at all times acting within the course and scope of such agency.

## **ARCIMOTO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

### *Arcimoto's Code of Conduct*

66.    The Code of Conduct, in its "Introduction," lists some of its purposes which include:

> (a)    promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;
>
> (b)    promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
>
> (c)    promote compliance with applicable governmental laws, rules and regulations;
>
> (d)    promote the protection of Company assets, including corporate opportunities and confidential information;
>
> (e)    promote fair dealing practices;
>
> (f)    deter wrongdoing; and
>
> (g)    ensure accountability for adherence to the Code.

67.    Moreover, the Code of Conduct states that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations[.]"

68.     With regard to conflicts of interest, the Code of Conduct states that "[c]onflicts of interest should be avoided unless specifically authorized[.]"

69.     With regard to "Compliance," the Code of Conduct provides that:

4.1     Employees, officers and directors should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates.

4.2     Although not all employees, officers and directors are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Chief Financial Officer, except that they should be addressed to the President in the event the questions regarding compliance involve the Chief Financial Officer.

4.3     No director, officer or employee may purchase or sell any Company securities while in possession of material non-public information regarding the Company, nor may any director, officer or employee purchase or sell another company's securities while in possession of material non-public information regarding that company. It is against Company policies and illegal for any director, officer or employee to use material non-public information regarding the Company or any other company to:

        (a)     obtain profit for himself or herself; or

        (b)     directly or indirectly "tip" others who might make an investment decision on the basis of that information.

70.     In addition, the Code of Conduct states that:

Each director, officer and employee who is involved in the Company's disclosure process must:

(a)     be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

(b)     take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

71.     The Code of Conduct also provides that "[a]ctions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee."

### *Insider Trading Compliance Policy*

72.   The Company maintains an "Insider Trading Compliance Policy" document which states, "it is the intention of the Company that it and all its employees shall comply with and observe all applicable securities laws, including the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Insider Trading and Securities Fraud Enforcement Act of 1988, by the Sarbanes-Oxley Act of 2002, and by other acts."

73.   The Insider Trading Compliance Policy further states that "[u]nder the Federal securities laws, "insiders" (i.e., officers, members of the Board of Directors and other individuals having access to material non-public information) are prohibited from trading in common stock and other securities on the basis of such material non-public information until after the information has been disclosed to the public."

### *Audit Committee Charter*

74.   The Company's Audit Committee Charters states that one of the Audit Committee's purposes is to "oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements."

75.   The Audit Committee Charter also describes the Audit Committee's responsibility to review "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies."

76.   The Individual Defendants violated the Code of Conduct, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross

mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, one of the Individual Defendants violated the Code of Conduct and the Company's Insider Trading Compliance Policy by selling Company shares at inflated prices for aggregate proceeds in excess of $372,000. Further in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.     Arcimoto is an Oregon corporation based in Eugene, Oregon that develops, markets, and sells three-wheeled electric vehicles.

78.     Throughout the Relevant Period, the Individual Defendants caused the Company to repeatedly tout its preorders and partnerships through a series of press releases while failing to disclose material information concerning these transactions.

79.     Moreover, the Individual Defendants caused the Company to assure the investing public that the Company's internal controls were adequate, despite this not being the case and as evidenced by the Company issuing the false and misleading statements at issue.

### False and Misleading Statements Made During the Relevant Period

*February 14, 2018 Press Release*

80.     On February 14, 2018 the Company issued a press release announcing a partnership with HULA, including the preorder of one hundred vehicles. The press release did not disclose that this was a related party transaction as HULA was owned by a Company shareholder. The press release stated, in relevant part:

> *Arcimoto, Inc.® (NASDAQ: FUV) — makers of the world's first Fun Utility Vehicle® (FUV®)* — an affordable, practical, and thrilling pure electric vehicle for everyday commuters and fleets, *today announced a partnership with HULA*

*Holdings* to launch EV Oasis, a one-of-a-kind electric vehicle charging, education, and rental center in Southern California.

Expected to open in San Diego, California in the summer of 2018, EV Oasis aims to be the quintessential west coast sustainable transportation hub. Planned amenities include 10 DC fast chargers and 24 Level 2 AC connections, educational kiosks, a local organic coffee shop, and an electric vehicle rental center featuring the Arcimoto FUV. *HULA Holdings has placed a deposit for 100 all-electric Arcimoto FUVs as part of their rental operation.*

(Emphasis added.)

### *May 14, 2018 Quarterly Report*

81.     On May 14, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). It was signed by Defendant Frohnmayer and contained certifications, signed by Defendants Frohnmayer and Campoli, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q18 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

82.     The 1Q18 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including Mark Frohnmayer, our President and Chief Executive Officer, and Douglas M. Campoli, our Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that

management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our President and Chief Executive Officer and our Chief Financial Officer concluded that as of March 31, 2018, our disclosure controls and procedures were designed to, and were effective to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures as of March 31, 2018.

(b) Changes in Internal Control Over Financial Reporting

Under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of any changes in our internal controls over financial reporting (as such terms are defined in Rules 13a-15(f) and 15d-15(f)) under the Exchange Act that occurred during the quarter ended March 31, 2018. Based on that evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that there has not been any material change in our internal control over financial reporting occurred during the period ended March 31, 2018, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *August 14, 2018 Quarterly Report*

83.    On August 14, 2018, the Company filed its quarterly report for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Frohnmayer and contained SOX certifications signed by Defendants Frohnmayer and Campoli attesting to the accuracy of the financial statements contained in the 2Q18 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

84.    The 2Q18 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a)  Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including Mark Frohnmayer, our President and Chief Executive Officer, and Douglas M. Campoli, our Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our President and Chief Executive Officer and our Chief Financial Officer concluded that as of June 30, 2018, our disclosure controls and procedures were designed to, and were effective to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures as of June 30, 2018.

(b) Changes in Internal Control Over Financial Reporting

Under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of any changes in our internal controls over financial reporting (as such terms are defined in Rules 13a-15(f) and 15d-15(f)) under the Exchange Act that occurred during the quarter ended June 30, 2018. Based on that evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that there has not been any material change in our internal control over financial reporting occurred during the period ended June 30, 2018, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 16, 2018 Quarterly Report***

85.     On November 16, 2018, the Company filed its quarterly report for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant

Frohnmayer and contained SOX certifications signed by Defendants Frohnmayer and Campoli attesting to the accuracy of the financial statements contained in the 3Q18 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

86.    The 3Q18 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including Mark Frohnmayer, our President and Chief Executive Officer, and Douglas M. Campoli, our Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our President and Chief Executive Officer and our Chief Financial Officer concluded that as of September 30, 2018, our disclosure controls and procedures were designed to, and were effective to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures as of September 30, 2018.

(b) Changes in Internal Control Over Financial Reporting

Under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of any changes in our internal controls over financial reporting (as such terms are defined in Rules 13a-15(f) and 15d-15(f)) under the

Exchange Act that occurred during the quarter ended September 30, 2018. Based on that evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that there has not been any material change in our internal control over financial reporting occurred during the period ended September 30, 2018, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### March 29, 2019 Annual Report

87.     On March 29, 2019, the Company filed its quarterly report for the 2018 Fiscal Year (the "2018 10-K"). The 2018 10-K was signed by Defendants Frohnmayer, Campoli, Becker, Curl, Scherer, and Eisler and contained SOX certifications signed by Defendants Frohnmayer and Campoli attesting to the accuracy of the financial statements contained in the 2018 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

88.     The 2018 10-K stated the following regarding the Company's internal controls, in pertinent part:

**(a) Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures, as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. Under the supervision and with the participation of our management, including Mark Frohnmayer, our President and Chief Executive Officer, and Douglas M. Campoli, our Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) under the Exchange Act, as of the end of the period covered by this report.

Based on that evaluation, our President and Chief Executive Officer and our Chief Financial Officer concluded that as of December 31, 2018, our disclosure controls and procedures were effective.

**(b) Changes in Internal Control Over Financial Reporting**

No changes were made to our internal control over financial reporting occurred during the period ended December 31, 2018, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### April 1, 2019 Proxy Statement

89.     On April 1, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Frohnmayer, Becker, Curl, Sherer, and Eisler solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

90.     The 2019 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Frohnmayer, Becker, Curl, Scherer, and Eisler to the Board; (2) approve an amendment to the Company's Amended and Restated Articles of Incorporation to increase the amount of authorized common stock from 20 million shares to 60 million shares; and (3) to approve an amendment to the Company's 2018 Omnibus Stock Incentive Plan (the "2018 Plan") to add an additional 1 million shares to the 2018 Plan for issuance to Company employees, officers, and directors.

91.     The 2019 Proxy Statement stated the following regarding the Board's, and each Board committee's, risk oversight functions:

> While our Company's senior management has responsibility for the management of risk, our board of directors plays an important role in overseeing this function. ***Our board regularly reviews our market and business risks during its formal and informal meetings and, since its formation, each of its committees has begun to oversee risks associated with its respective area of responsibility. In particular, our audit committee oversees risk related to our accounting, tax, financial and public disclosure processes. It also assesses risks associated with our financial***

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

*assets. Our compensation committee oversees risks related to our compensation and benefit plans and policies to ensure sound pay practices that do not cause risks to arise that are reasonably likely to have a material adverse effect on our Company. Our nominating and governance committee seeks to minimize risks related to our governance structure by implementing sound corporate governance principles and practices.* Each of our committees reports to the full board as appropriate on its efforts at risk oversight and on any matter that rises to the level of a material or enterprise level of risk.

(Emphasis added.)

92.     The 2019 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Curl (as Chair), Scherer, and Eisler. These responsibilities included, "reviewing and discussing the adequacy and effectiveness of our accounting and financial reporting processes and controls[,]" "establishing and overseeing procedures for the receipt, retention, and treatment of complaints received by us regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential, anonymous submission by our employees regarding questionable accounting or auditing matters[,]" and "reviewing and approving related-party transactions for potential conflict of interest situations on an ongoing basis[.]"

93.     The 2019 Proxy Statement also had the following to say regarding the administration of the 2018 Plan:

The 2018 Plan is administered by our compensation committee. With respect to grants of awards to our officers or directors, the 2018 Plan is administered by our compensation committee in a manner that permits such grants and related transactions to be exempt from Section 16(b) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. The plan administrator has the full authority to select recipients of the grants, determine the extent of the grants, establish additional terms, conditions, rules or procedures to accommodate rules or laws of applicable non-U.S. jurisdictions, adjust awards and to take any other action deemed appropriate; however, no action may be taken that is inconsistent with the terms of the 2018 Plan.

94.     The 2019 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2019 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the amendment to the 2018 Plan.

95.     The 2019 Proxy Statement also failed to disclose that: (1) the Company's announced preorders were either not filled or completely fabricated; (2) the Company's vehicles suffered from safety defects which would lead to a recall of all or nearly all of them; (3) the Company's touted partnership with HULA was an undisclosed related party transaction; and (4) the Company failed to maintain adequate internal controls.

96.     As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders reelected Defendants Frohnmayer, Becker, Curl, Scherer, and Eisler to the Board, allowing them to continue breaching their fiduciary duties to Arcimoto, and approved the amendments to the 2018 Plan, allowing the Individual Defendants to receive more unjust compensation.

### *May 9, 2019 Quarterly Report*

97.     On May 9, 2019, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). It was signed by Defendant Frohnmayer and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 1Q19 10-Q, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.     The 1Q19 10-Q stated the following regarding the Company's internal controls, in pertinent part:

a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

Based on this evaluation, out Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f) occurred during the period ended March 31, 2019, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***June 3, 2019 Press Release***

99.     On June 3, 2019, the Company issued a press release announcing an agreement reached with GoCar Tours, including a forty-vehicle order. The press release stated, in pertinent part:

***Arcimoto, Inc.®, (NASDAQ: FUV)*** makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets — ***announced today that it will develop a next-gen fleet of FUVs with GoCar Tours for GPS-guided tours of San Francisco.***

***An initial order of 40 FUVs will be outfitted with GoCar's patented GoCar Network technology***, which allows users to explore the city on their own schedule at their own pace. The GoCar's mobile tour guide, the world's first GPS-guided tour, will give directions, crack jokes, recommend restaurants, and tell the legendary stories that bring San Francisco to life.

(Emphasis added.)

### June 19, 2019 Press Release

100.    On June 19, 2019, the Company issued a press release announcing the Company's agreement with Sol Mar Vida, in Costa Rica, including an order of one hundred vehicles. The press release stated, in pertinent part:

> ***Arcimoto, Inc.®, (NASDAQ: FUV)*** makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets — ***announced today that it plans to deploy the first international fleet of pure electric FUVs to Costa Rica starting later this year in collaboration with Sol Mar Vida.***
>
> Over the span of three years, ***Arcimoto and Sol Mar Vida plan to deploy 100 FUVs to be used as tourist rentals in Guanacaste province.*** Users will be able to rent the FUV directly at beachside hotels from Tamarindo to Playa Hermosa, a stunning stretch of white-sand beaches and world-class surf breaks known as the Gold Coast of Costa Rica.

(Emphasis added.)

### August 14, 2019 Quarterly Report

101.    On August 14, 2019, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). It was signed by Defendant Campoli and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 2Q19 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

102.    The 2Q19 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the period ended June 30, 2019, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***October 2, 2019 Press Release***

103.    On October 2, 2019, the Company issued a press release announcing its first rental franchisee, R-KEY-MOTO LLC ("R-KEY-MOTO"). The press release did not note that R-KEY-MOTO was owned by one of the Company's largest shareholders—which, according to the 2019 Proxy Statement, beneficially owned 1,442,857 shares of the Company's common stock representing 9.3% of shares outstanding as of March 22, 2019—FOD Capital. The press release stated, in pertinent part:

> ***Arcimoto, Inc.®, (NASDAQ: FUV)*** makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets — ***announced today that it has signed its first rental franchise, which will open in the Florida Keys and be operated by Key West-based franchisee R-KEY-MOTO, LLC.***

> We think Key West will be an amazing home for our first rental franchise and pilot of our rental franchise model," said Arcimoto founder and president Mark Frohnmayer. "We are very excited to partner with the R-KEY-MOTO team, combining their local market expertise and resources with Arcimoto's ultra-efficient and very fun vehicles."

> Located at the Stock Island Marina Village, ***the new FUV Hub location will house 21 FUVs to be used as rental vehicles*** for tourists and cruise ship passengers to explore Key West, one of the most popular tourist destinations in

the world. In addition, the FUV Hub will share vehicles with the A&B Marina Complex and the Perry Hotel Key West. Guests will be able to rent FUVs directly from the concierge and explore Stock Island and Key West.

*    *    *

***The Florida Keys will be the first Arcimoto rental franchise, and the fourth FUV rental location, with partnerships previously announced with Hula Multimodal in San Diego and Encinitas, Calif., as well as with GoCar Tours in San Francisco.*** In the Arcimoto franchise model, rental franchises will utilize Arcimoto branding and technologies, including the Arcimoto mobile app, to create a one-of-a-kind tourism experience and unforgettable joyride.

(Emphasis added.)

### October 30, 2019 Press Release

104.    On October 30, 2019, the Company issued a press release announcing a distribution agreement with a New Zealand–based company. The press release stated, in pertinent part:

***Arcimoto, Inc.®, (NASDAQ:FUV)*** makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ - affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets - announced today that it has ***entered into a distribution agreement with New Zealand-based EV Distributors to deliver a minimum of 160 Arcimoto vehicles over the next four years.*** To kick off the agreement, Arcimoto has made its first international vehicle shipment, and three FUVs are now bound for Auckland, scheduled to arrive in November.

(Emphasis added.)

### November 14, 2019 Quarterly Report

105.    On November 14, 2019, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). It was signed by Defendant Campoli and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 3Q19 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.    The 3Q19 10-Q stated the following regarding the Company's internal controls, in

pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our
Chief Executive Officer and our Chief Financial Officer, we conducted an
evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e)
and 15d-15(e) under the Exchange Act, as of the end of the period covered by this
report.

Based on this evaluation, our Chief Executive Officer and our Chief Financial
Officer concluded that our disclosure controls and procedures were effective as of
the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial
reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the
period ended September 30, 2019, that materially affected, or is reasonably likely
to materially affect, our internal control over financial reporting.

***March 10, 2020 Press Release***

107.    On March 10, 2020, the Company issued a press release announcing a partnership

with the Eugene Springfield Fire Department to test one of the Company's products. The press

release stated, in pertinent part:

***Arcimoto, Inc.® (NASDAQ: FUV) and Eugene Springfield Fire Department***
***announced today that they have begun the first pilot program for testing the***
***Rapid Responder***™, a pure electric three-wheeled vehicle designed for first
responders to more quickly and efficiently reach emergencies at a fraction of the
economic and environmental costs of traditional diesel-powered vehicles.

(Emphasis added.)

***April 14, 2020 Annual Report***

108.    On April 14, 2020 the Company filed its annual report for the 2019 Fiscal Year

with the SEC on Form 10-K (the "2019 10-K"). The 2019 10-K was signed by Defendants

Frohnmayer, Campoli, Becker, Scherer, and Eisler, and contained SOX certifications signed by

Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 2019 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.    The 2019 10-K stated the following concerning the Company's internal controls, in pertinent part:

> (a) Evaluation of Disclosure Controls and Procedures
>
> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report. Management use the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") (2013) to evaluate internal disclosure controls and procedures.
>
> Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.
>
> (b) Changes in Internal Control Over Financial Reporting
>
> There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the period ended December 31, 2019, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Original emphasis removed.)

### *April 29, 2020 Proxy Statement*

110.    On April 29, 2019, the Company filed a proxy statement on Schedule 14A with the SEC (the "2020 Proxy Statement"). Defendants Frohnmayer, Becker, Calderon, Sherer, and Eisler solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are

111.    The 2020 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Frohnmayer, Becker, Calderon, Scherer, and Eisler to the Board; and (2) to approve another amendment to the Company's 2018  Plan to add an additional 2 million shares to the 2018 Plan for issuance to Company employees, officers, and directors.

112.    The 2020 Proxy Statement stated the following, regarding the Board's, and each Board committee's, risk oversight functions:

> While our Company's senior management has responsibility for the management of risk, our board of directors plays an important role in overseeing this function. ***Our board regularly reviews our market and business risks during its formal and informal meetings and, since its formation, each of its committees has begun to oversee risks associated with its respective area of responsibility. In particular, our audit committee oversees risk related to our accounting, tax, financial and public disclosure processes. It also assesses risks associated with our financial assets. Our compensation committee oversees risks related to our compensation and benefit plans and policies to ensure sound pay practices that do not cause risks to arise that are reasonably likely to have a material adverse effect on our Company. Our nominating and governance committee seeks to minimize risks related to our governance structure by implementing sound corporate governance principles and practices.*** Each of our committees reports to the full board as appropriate on its efforts at risk oversight and on any matter that rises to the level of a material or enterprise level of risk.

(Emphasis added.)

113.    The 2020 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Scherer (as Chiar), Eisler, and Calderon. Defendant Curl also served on the Audit Committee during the 2019 Fiscal Year but had resigned from the Board by the filing of the 2020 Proxy Statement. The Audit Committee responsibilities included, "reviewing and discussing the adequacy and effectiveness of our accounting and

---

based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

financial reporting processes and controls[,]" "establishing and overseeing procedures for the receipt, retention, and treatment of complaints received by us regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential, anonymous submission by our employees regarding questionable accounting or auditing matters[,]" and "reviewing and approving related-party transactions for potential conflict of interest situations on an ongoing basis[.]"

114.    The 2020 Proxy Statement also said the following regarding the administration of the 2018 Plan, in pertinent part:

> The 2018 Plan is administered by our compensation committee. With respect to grants of awards to our officers or directors, the 2018 Plan is administered by our compensation committee in a manner that permits such grants and related transactions to be exempt from Section 16(b) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. The plan administrator has the full authority to select recipients of the grants, determine the extent of the grants, establish additional terms, conditions, rules or procedures to accommodate rules or laws of applicable non-U.S. jurisdictions, adjust awards and to take any other action deemed appropriate; however, no action may be taken that is inconsistent with the terms of the 2018 Plan.

115.    The 2020 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2020 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the amendment to the 2018 Plan.

116.    The 2020 Proxy Statement also failed to disclose that: (1) the Company's announced preorders were either not filled or completely fabricated; (2) the Company's vehicles

suffered from safety defects which would lead to a recall; (3) the Company's single largest customer was an undisclosed related party owned by FOD Capital, which was at one time among the Company's largest shareholders; (4) the Company's touted partnerships with HULA was also an undisclosed related party transaction; and (5) the Company failed to maintain adequate internal controls.

117.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders reelected Defendants Frohnmayer, Becker, Calderon, Scherer, and Eisler to the Board, allowing them to continue breaching their fiduciary duties to Arcimoto, and approved the amendments to the 2018 Plan, allowing the Individual Defendants to receive more unjust compensation.

### June 11, 2020 Quarterly Report

118.    On June 11, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"). It was signed by Defendant Campoli and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 1Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.    The 1Q20 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report. Management uses the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway

Commission ("COSO") (2013) to evaluate internal disclosure controls and procedures.

Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the period ended March 31, 2020, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *July 22, 2020 Press Release*

120.    On July 22, 2020 the Company issued a press release announcing a pilot program with the restaurant Wahlburgers, to test one of the Company's products. The press release stated in relevant part:

> ***Arcimoto, Inc.® (NASDAQ: FUV)***, makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™—affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets—***and Wahlburgers are teaming up on a pilot program to field test the Deliverator, Arcimoto's ultra-efficient, three-wheel electric vehicle designed for local and last-mile delivery.*** The pilot program is anticipated to begin this August at the newest Wahlburgers location coming to the boardwalk of the world-renowned Historic Key West Seaport from the restaurant brand founded by Chef Paul Wahlberg along with brothers Donnie and Mark.

(Emphasis added.)

### *August 19, 2020 Quarterly Report*

121.    On August 19, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"). It was signed by Defendant Campoli and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

122.     The 2Q20 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report. Management uses the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") (2013) to evaluate internal disclosure controls and procedures.

Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the period ended June 30, 2020, that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 16, 2020 Quarterly Report***

123.     On November 16, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2020 (the "3Q20 10-Q"). It was signed by Defendant Campoli and contained SOX certifications, signed by Defendants Frohnmayer and Campoli, attesting to the accuracy of the financial statements contained in the 3Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    The 3Q20 10-Q stated the following regarding the Company's internal controls, in pertinent part:

(a) Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report. Management uses the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") (2013) to evaluate internal disclosure controls and procedures.

Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

(b) Changes in Internal Control Over Financial Reporting

There has not been any material change in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or Rule 15d-15(f)) during the period ended June 30, 2020 [sic], that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 19, 2020 Press Release***

125.    On November 19, 2020, the Company issued a press release announcing a partnership with the City of Orlando. The press release stated, in pertinent part:

***Arcimoto, Inc.® (NASDAQ: FUV)***, makers of affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets, ***today announced that it has entered into its first municipal fleet pilot program, with the City of Orlando. Together, the City will test Arcimoto vehicles across six city departments***, continuing Mayor Buddy Dyer's efforts to transform Orlando into one of the most environmentally-friendly, economically and socially vibrant communities in the nation.

\*      \*      \*

***Over the course of the 90-day pilot program, Arcimoto vehicles are expected to be tested by Orlando Fire Department, Police Department, Code Enforcement Division, Permitting Services, Venues, and Parking Enforcement.*** This is the latest milestone of the City's Office of Sustainability and Resiliency, which has

recently worked to convert hundreds of fleet vehicles to electric, hybrid, or compressed natural gas; is working to enable more than 500 Level 2 charging stations citywide; and launched sharing programs for cars, scooters, and bikes.

(Emphasis added.)

126.    The statements contained in ¶¶ 80–88, 97–109, and 118–125 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's announced preorders, totaling 422 vehicles, were either not filled or completely fabricated, with only nineteen vehicles actually delivered; (2) all or almost all of the Company's vehicles were or would be under a safety recall; (3) the Company's single largest customer was an undisclosed related party owned by FOD Capital, which was at one time among the Company's largest shareholders; (4) another of the Company's touted partnerships with HULA was also an undisclosed related party transaction; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Arcimoto's public statements touting the Company's partnerships, preorders, and effective internal controls were materially false and misleading at all relevant times.

## The Truth Emerges

127.    On March 23, 2021, *Bonitas Research* published the Bonitas Report before markets opened. The Bonitas Report revealed that the Company was misleading the public regarding its partnerships and preorders. In pertinent part, the Bonitas report stated:

In March 2021 *we reviewed six (6) different partnerships touted by Arcimoto* since 2018. Specifically for these partnerships, *we found that less than 5% of Arcimoto's "pre-orders" were delivered*.

The below table is a summary of our findings.

| Announced Partners | Claimed Pre-Order # | Delivered Unit # | Announcement Date |
|---|---|---|---|
| Arcimoto Key West | 21 | 13 | 02-Oct-19 |
| Hula | 100 | 0 | 14-Feb-18 |
| GoCar Tours (SF) | 40 | 2 | 03-Oct-19 |
| Sol Mar Vida | 100 | 0 | 19-Jun-19 |
| New Zealand distributor | 160 | 3 | 30-Oct-19 |
| Wahlburgers Key West | 1 | 1 | 22-Jul-20 |
| **Total** | **422** | **19** | |
| *% Delivered* | | *4.5%* | |

*Source: FUV Press Releases; Bonitas Outbound Calls to Customers*

(Emphasis added.)

128.   The Bonitas Report further revealed the safety issues plaguing the Company's

vehicles, which had resulted in safety recalls. The Bonitas Report stated, in relevant part:

> **On November 18, 2020, Arcimoto filed a total production recall notice** with the
> United States Government's federal agency, the National Highway Traffic Safety
> Administration ("NHTSA") (https://www.nhtsa.gov/), due to safety issues with the
> electronic drivers in the vehicles which can "lead to unexpected battery shutdown
> and immediate loss of traction-power".
>
> *       *       *
>
> **Instead of notifying customers and investors of the bad news, the next day on**
> **November 19, 2020 Arcimoto management promoted a 90-day trial with the City**
> **of Orlando's first responder units.**
>
> **In March 2021 we spoke with sales representatives at both Arcimoto Key West**
> **and GoCar Tours and confirmed that neither customer had been notified** of
> Arcimoto's November 2020 product safety recall.
>
> Arcimoto's November 2020 recall was preceded by two other recalls in March &
> May 2020 due to non-compliant brake hoses and improper traction-power harness
> that can lead to, among other things, "risk of fire, and loss of traction-power".
>
> **Since December 2018, Arcimoto has filed 19 separate recall notices, the majority**
> **related to the most basic elements of a vehicle such as power, steering and**
> **braking.**

(Emphasis added; original emphasis and citation omitted.)

129.    Moreover, the Bonitas Report revealed that the touted deals with R-KEY-MOTO and Wahlburgers were actually undisclosed related party transactions with FOD Capital. The Bonitas Report stated, in relevant part:

**LARGEST CUSTOMER IS UNDISCLOSED RELATED PARTY FOD CAPITAL**

Additional evidence corroborates that there exists little demand for Arcimoto's vehicles from independent paying customers.

*Our findings revealed that as of March 2021, Arcimoto Key West had 13 Arcimoto vehicles on-site, making it the single largest location of Arcimoto vehicles worldwide outside of Eugene, Oregon (Arcimoto's HQ).*

*In 4Q'19, Arcimoto announced its first rental franchisee customer in Key West as R-Key-Moto, LLC ("R-Key-Moto").*

*Arcimoto Founder Mark Frohnmayer boasted on FUV's 1Q'20 earnings call that R-Key-Moto was "almost up to their full plan of 20 vehicles."*

In Arcimoto's 3Q'2020 earnings conference call webinar highlighted the franchisee partnership as a success.

*                *                *

*However, Arcimoto never mentioned in its investor communications via SEC filings, presentations, earnings calls or promotional videos that R-Key-Moto is an undisclosed related party owned by insider FOD Capital, LLC ("FOD Capital").*

While Founder Mark Frohnmayer boasted in the 1Q'20 Earnings Call that R-Key-Moto was "almost up to their full plan of 20 vehicles", *Arcimoto never disclosed any related party revenues from FOD Capital, which at US$ 20,000 per vehicle would amount up to US$ 420,000, or 29% of Arcimoto's total product revenue in 4Q'19 and 1Q'20.*

R-Key-Moto's 2020 Annual Report lists Michael Raymond and Matthew Strunk as Managers, who are respectively the Managing Director and Director of Accounting and Finance of FOD Capital.

In addition, R-Key-Moto shares the same registered address as FOD Capital.

*                *                *

*In 3Q'20, Arcimoto promoted a pilot program for its Deliverator vehicle with Wahlburgers Key West*, whipping up investors' hope for a nation-wide deal with the Mark Wahlberg restaurant chain.

*Arcimoto once again failed to disclose that Wahlburgers Key West is actually operated as a franchisee location by Wahlkey, LLC ("Wahlkey"), which is owned by undisclosed related party shareholder FOD Capital.*

Wahlkey's 2021 Annual Report lists Michael Raymond as its manager and the same address as FOD Capital.

(Emphasis added, original emphasis and citations omitted.)

130.    The Bonitas Report also revealed that the Company's partnership with HULA was another related party transaction, and in addition that the deal was not going according to plan. The Bonitas Report revealed, in pertinent part:

## ARCIMOTO'S SAN DIEGO RENTAL PARTNER HULA CHOSE AYRO

*On February 14, 2018, Arcimoto announced a 100-unit "pre-orders" [sic] from its partnership with Hula* to launch EV Oasis, "a one-of-a-kind electric vehicle charging, education, and rental center in Southern California"("Hula Facility") in San Diego, California.

*At the time Hula's owner was an FUV shareholder, making it another transaction with an undisclosed shareholder.*

FUV updated investors on October 30, 2018 that it planned to open and operate the Hula Facility with Hula at a 4,491 square-foot facility at 630 Tenth Avenue, San Diego.

Hula's official Youtube channel contained two videos published in 1Q'19 that showcased Arcimoto's FUV vehicles in a retail rental location in East Village, downtown San Diego, CA.

*Arcimoto Founder Mark Frohnmayer claimed on Arcimoto's 3Q'19 earnings call that the Hula Facility would open in 1Q'20. Arcimoto's SEC filings Arcimoto reported that it had co-leased the Hula Facility whereby Hula would pay 65% of the rent for the Hula facility.*

*Arcimoto's 2019 10-K filed on April 14, 2020 disclosed that Hula had yet to make the promised rental payments.*

On November 10, 2020, Hula uploaded a new video from a different warehouse in National City that was full of Ayro 311 vehicles from Arcimoto's direct competitor.

(Emphasis added, original emphasis and citations omitted.)

131.    On this news, which was released before the markets opened, the Company's share price declined by $1.10 per share—more than 6.5%—from its March 22, 2021 closing price of $16.77 per share to close March 23, 2021 at $15.67.

## DAMAGES TO ARCIMOTO

132.    As a direct and proximate result of the Individual Defendants' misconduct, Arcimoto has lost and will continue to lose and expend many millions of dollars.

133.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Actions filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.    Such expenditures also include, but are not limited to, the costs incurred by the Company in recalling the Company's defective vehicles and refunding those customers who were not notified of the recall order.

135.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including any unjust compensation paid to the Individual Defendants in connection with the 2018 Plan as amended.

136.    As a direct and proximate result of the Individual Defendants' conduct, Arcimoto has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

137.    Plaintiff brings this action derivatively and for the benefit of Arcimoto to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Arcimoto, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

138.    Arcimoto is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.    Plaintiff is, and has been at all relevant times, a shareholder of Arcimoto. Plaintiff will adequately and fairly represent the interests of Arcimoto in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

141.    A pre-suit demand on the Board of Arcimoto is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Frohnmayer, Becker, Calderon, Eisler, and Scherer (the "Director-Defendants"), and nonparty Galileo A. Russell ("Russell") (collectively with the Director-Defendants, the "Directors").

Plaintiff needs only to allege demand futility as to three of six Directors who are on the Board at the time this action is commenced.

142.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them conducted insider sales for proceeds of approximately $372,000, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.    Additional reasons that demand on Defendant Frohnmayer is futile follow. Defendant Frohnmayer has served as the Company's CEO, President, and Chairman of the Board since he founded the Company in November 2007. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Frohnmayer with his principal occupation for which he receives handsome compensation, including compensation paid under the 2018 Plan which was amended in part due to the false and misleading statements for which the Individual Defendants are responsible. In addition, as of April 14, 20210 Defendant Frohnmayer beneficially owned 21.1% of the Company's outstanding common stock, which together with his positions at

the Company make him a controlling shareholder. As CEO and President, Defendant Frohnmayer was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements contained in the 1Q18 10-Q, 2Q18 10-Q, 3Q18 10-Q, 2018 10-K, 1Q19 10-Q, and 2019 10-K, each of which he personally signed. In addition, both the 2019 Proxy Statement and 2020 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Frohnmayer is a defendant in the Securities Class Actions. For these reasons, Defendant Frohnmayer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Becker is futile follow. Defendant Becker has served as a Company director since May 2015 and as the Company's COO since September 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Becker with his principal occupation for which he receives handsome compensation, including compensation paid under the 2018 Plan which was amended in part due to the false and misleading statements for which the Individual Defendants are responsible. In addition, Defendant Becker signed, and thus personally made, the false and misleading statements contained in the 2018 10-K and 2019 10-K. Moreover, both the 2019 Proxy Statement and 2020 Proxy Statement were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As COO and a trusted Company director, he

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Becker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Calderon is futile follow. Defendant Calderon has served as a Company director since April 2020. She also serves as the Chair of both the Audit Committee and the Nominating and Governance Committee. As a Company director, she receives significant compensation from the Company, including compensation paid under the 2018 Plan which was amended in part due to the false and misleading statements for which the Individual Defendants are responsible. The 2020 Proxy Statement was solicited on her behalf and the false and misleading statements contained therein contributed to her election to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Calderon breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Eisler is futile follow. Defendant Eisler has served as a Company director since September 2018. He also serves as Chair of the Compensation Committee and as a member of both the Audit Committee and the Nominating and Governance Committee. As a Company director, he receives significant compensation from the

Company, including compensation paid under the 2018 Plan which was amended in part due to the false and misleading statements for which the Individual Defendants are responsible. Defendant Eisler signed, and thus personally made, the false and misleading statements contained in the 2018 10-K and 2019 10-K. Moreover, the 2019 Proxy Statement and the 2020 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he sold 11,780 shares of Company common stock at artificially inflated prices for proceeds of approximately $372,000. For these reasons, Defendant Eisler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.   Additional reasons that demand on Defendant Scherer is futile follow. Defendant Scherer has served as a Company director since September 2018. He serves as the Company's Lead Independent Director, and also serves as a member on each of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2018 Plan which was amended in part due to the false and misleading statements for which the Individual Defendants are responsible. Defendant Scherer signed, and thus personally made, the false and misleading statements contained in the 2018 10-K and 2019 10-K. Moreover, the 2019 Proxy Statement and the 2020 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted

Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Scherer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Frohnmayer and Campoli have prior experience working together from their overlapping time at GarageGames.com, Inc., which Defendant Frohnmayer founded. In addition, Defendants Frohnmayer, Becker, and Campoli have worked together at the Company in executive roles for over five years, with Defendant Becker even leaving then rejoining the Company. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

151.    Defendants Calderon, Eisler, and Scherer (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and reviewing and taking steps to remedy any deficiencies with the Company's system of internal controls. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to

identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

152.    Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Frohnmayer, who is founder, President, CEO, Chairman, and a controlling shareholder with beneficial ownership of 21.1% of the Company's common stock as of April 14, 2021. In light of this of this, the Directors cannot impartially consider a demand against Defendant Frohnmayer, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Becker who is also an executive at Arcimoto. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Frohnmayer's control over them.

153.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

154.     Arcimoto has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Arcimoto any part of the damages Arcimoto suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

155.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

156.     The acts complained of herein constitute violations of fiduciary duties owed by Arcimoto's officers and directors, and these acts are incapable of ratification.

157.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Arcimoto. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Arcimoto, there would be no directors' and officers'

insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the Directors will not cause Arcimoto to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

159.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Frohnmayer, Becker, Calderon, Curl, Eisler, and Scherer for Violations of Section 14(a) of the Exchange Act**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

163.    Under the direction and watch of the Defendants Frohnmayer, Becker, Calderon, Curl, Eisler, and Scherer,[3] the 2019 Proxy Statement and the 2020 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2019 Proxy Statement's and 2020 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the amendment to the 2018 Plan. The 2019 Proxy Statement and 2020 Proxy Statement further failed to disclose that: (1) the Company's announced preorders, totaling 422 vehicles, were either not filled or completely fabricated, with only nineteen vehicles actually delivered; (2) all or almost all of the Company's vehicles were or would be under a safety recall; (3) the Company's single largest customer was an undisclosed related party owned by FOD Capital, which was at one time among the Company's largest shareholders; (4) another of the Company's touted partnerships with HULA was also an undisclosed related party transaction; and (5) the Company failed to maintain adequate internal

---

[3] This claim is against Defendant Curl only for the statements made in the 2019 Proxy Statement and against Defendant Calderon only for the statements made in the 2020 Proxy Statement. This claim is against Defendants Frohnmayer, Becker, Eisler, and Scherer for both the 2019 Proxy Statement and the 2020 Proxy Statement.

controls As a result, the 2019 Proxy Statement and 2020 Proxy Statement were materially false and misleading.

164.    In the exercise of reasonable care, Defendants Frohnmayer, Becker, Calderon, Curl, Eisler, and Scherer should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement and the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement and the 2020 Proxy Statement, including but not limited to, the election of Defendants Frohnmayer, Becker, Calderon, Curl, Eisler, and Scherer and the approval of amendments to the 2018 Plan.

165.    The false and misleading elements of the 2019 Proxy Statement and the 2020 Proxy Statement led to, among other things, the election of the Defendants Frohnmayer, Becker, Calderon, Curl, Eisler, and Scherer, which allowed them to continue to breach their fiduciary duties to Peloton. The false and misleading elements of the 2019 Proxy Statement and the 2020 Proxy Statement also led the Company's shareholders to approve amendments to the 2018 Plan, allowing the Individual Defendants to receive more unjust compensation.

166.    The Company was damaged as a result of the Defendants Frohnmayer's, Becker's, Calderon's, Curl's, Eisler's, and Scherer's material misrepresentations and omissions in the 2019 Proxy Statement and 2020 Proxy Statement.

167.    Plaintiff, on behalf of Peloton, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

168.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Arcimoto's business and affairs.

170.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

171.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Arcimoto.

172.    In breach of their fiduciary duties owed to Arcimoto, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's announced preorders, totaling 422 vehicles, were either not filled or completely fabricated, with only nineteen vehicles actually delivered; (2) all or almost all of the Company's vehicles were or would be under a safety recall; (3) the Company's single largest customer was an undisclosed related party owned by FOD Capital, which was at one time among the Company's largest shareholders; (4) another of the Company's touted partnerships with HULA was an undisclosed related party transaction; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Arcimoto's public statements touting its partnerships, preorders, and internal controls were materially false and misleading at all relevant times.

173.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while one of them conducted insider sales of Company common stock for proceeds of approximately $372,000, which renders them personally liable to the Company for breaching their fiduciary duties.

174.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

175.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Arcimoto's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

176.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Arcimoto has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.    Plaintiff on behalf of Arcimoto has no adequate remedy at law.

### **THIRD CLAIM**

**Against the Individual Defendants for Unjust Enrichment**

179.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Arcimoto.

181.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Arcimoto that was tied to the performance or artificially inflated valuation of Arcimoto, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received under the 2018 Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

182.     Plaintiff, as a shareholder and a representative of Arcimoto, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

183.     Plaintiff on behalf of Arcimoto has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

184.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Arcimoto, for which they are legally responsible.

186.    As a direct and proximate result of the Individual Defendants' abuse of control, Arcimoto has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187.    Plaintiff on behalf of Arcimoto has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Arcimoto in a manner consistent with the operations of a publicly-held corporation.

190.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Arcimoto has sustained and will continue to sustain significant damages.

191.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

192.    Plaintiff on behalf of Arcimoto has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

195.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Arcimoto to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196.     As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

197.     Plaintiff on behalf of Arcimoto has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Frohnmayer and Campoli for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

198.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.     Arcimoto, Defendant Frohnmayer, and Defendant Campoli are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Frohnmayer's and Campoli's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or director of Arcimoto.

200.     Defendants Frohnmayer and Campoli, because of their positions of control and authority as CEO and CFO of Arcimoto, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Arcimoto, including the wrongful acts complained of herein and in the Securities Class Actions.

201.    Accordingly, Defendants Frohnmayer and Campoli are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

202.    As such, Arcimoto is entitled to receive all appropriate contribution or indemnification from Defendants Frohnmayer and Campoli.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Arcimoto, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Arcimoto;

(c)    Determining and awarding to Arcimoto the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Arcimoto and the Individual Defendants to take all necessary actions to reform and improve Arcimoto's corporate governance and internal procedures to comply with applicable laws and to protect Arcimoto and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Arcimoto to nominate at least three candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)   Awarding Arcimoto restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated: June 30, 2021                    Respectfully submitted,


**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, An An Liu am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

6/30/2021

DocuSigned by:

*An An Liu*

042FC4E7775E4E7...

An An Liu